# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| EMILY KAPSZUKIEWICZ and HEALTHCARE SHARES, P.B.C., <br><br> *Plaintiffs*, <br><br> – v. – <br><br> UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> *Defendants*. | Civil Action No. 4:25-cv-975 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      America faces a historic wealth gap crisis, and the U.S. Securities and Exchange Commission's ("SEC") regulations are making it worse. While anyone can place bets on sports or play poker for money from their phone, the SEC's "accredited investor" rule, effectively excludes the vast majority of Americans from accessing private investment opportunities—the very opportunities that have historically generated great wealth for American families.

2.      The Financial Restriction rule portion of the accredited investor rule (17 C.F.R. § 230.501(a)(5)) ("accredited investor rule") requires individuals make over $200,000 annually for the past two years (or $300,000 with a spouse) or who has a net worth of over $1 million—creating an artificial barrier between everyday Americans and wealth-building opportunities under the guise of "investor protection." This barrier is particularly damaging given the declining number of publicly-traded companies today, leaving average investors with limited investment choices. Meanwhile, the vast landscape

of private investment opportunities—including promising startups, growing private companies, and innovative ventures—remains accessible primarily to the wealthy.

3.     Plaintiff Emily Kapszukiewicz ("Kapszukiewicz") is one victim (of many) of this arbitrary rule. A successful healthcare professional, she has a net worth of approximately $850,000, and an annual income of approximately $195,000. She holds a Bachelor of Arts degree in Economics and a Master of Science degree in Applied Economics from Marquette University. Her professional experience is extensive including, strategic initiatives, financial modeling, and business transformation, including identifying over $300 million in potential patient revenue at a healthcare services company. She has demonstrated financial sophistication through creating price elasticity models, conducting enterprise-level financial analyses, and developing economic frameworks that measure customer lifetime value in healthcare settings. However, she is not an "accredited investor" according to SEC regulations.

4.     Healthcare Shares, P.B.C. ("Healthcare Shares") is a Delaware public benefit corporation with its principal place of business in Fort Worth, Texas. Healthcare Shares operates a venture capital fund, Fund I, a series of Healthcare Shares, LP (the "Fund"), which focuses on investing in healthcare startups with the goal of having a positive social impact in healthcare and public health. As a public benefit corporation, Healthcare Shares is committed to balancing social impact with financial returns. Unlike traditional C-Corporations whose primary interest is maximizing shareholder value, public benefit corporations balance stakeholders' pecuniary interests, the interests of those who are involved and affected by the corporation, as well as the advancement of their intended public benefit goal for improving society.

5.     Healthcare Shares joins this action as a co-plaintiff because the SEC's accredited investor rule arbitrarily restrict its ability to accept investments from knowledgeable and experienced individuals like Kapszukiewicz, who lack the requisite wealth or income requirements, but possess the expertise and commitment aligned with Healthcare Shares' mission. This arbitrary rule damages Healthcare Shares by reducing its assets under management, reducing the amount of management fees it earns, and reducing the amount of capital it has available to invest in profitable investment opportunities which may reduce its carried interest earned from the fund.

6.     The SEC's accredited investor rule, is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). The SEC acted arbitrarily and capriciously by, among other things, failing to examine the relevant data and failing to satisfactorily explain its action by failing to provide any rational connection between the facts found and the decision made to issue the rule.

7.     The SEC's accredited investor rule fails this standard because it uses wealth as a proxy for sophistication without sufficient justification. Wealth does not correlate with investment acumen. Many non-wealthy individuals, like Kapszukiewicz, possess the knowledge and experience to evaluate private investments but are excluded by the SEC's arbitrary thresholds.

## JURISDICTION AND VENUE

8.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The action arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*., and the APA, 5 U.S.C. § 706(2), which instructs the Court to "hold unlawful and set aside agency

action" that is "in excess of statutory jurisdiction, authority, or limitations," or is "arbitrary, capricious," or "otherwise not in accordance with law." *Id*.

9.      Venue is proper in this district because Plaintiff Healthcare Shares has its principal place of business in this District, Defendant SEC has an office herein, and because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b)(1)-(2).

## PARTIES

10.      Plaintiff Emily Kapszukiewicz is a resident of Oregon with a net worth of approximately $850,000 and an annual income below $200,000.

11.      Plaintiff Healthcare Shares, P.B.C. is a Delaware public benefit corporation with its principal place of business in Fort Worth, Texas. Healthcare Shares operates a venture capital fund focused on healthcare innovation and is committed to including healthcare professionals as investors to leverage their expertise in identifying and supporting promising healthcare startups.

12.      Defendant Securities and Exchange Commission is an agency of the Government of the United States subject to the APA. *See* 5 U.S.C. § 551(1).

## FACTUAL ALLEGATIONS

**A.      Kapszukiewicz is excluded from investing in Fund I, a series of Healthcare Shares, LP, based solely her yearly income and net worth.**

13.      In February 2025, Kapszukiewicz entered into an advisor agreement with Healthcare Shares to provide advisory services related to investments in healthcare startups. As part of her role, Kapszukiewicz was to receive carried interest from investments made by Fund I, a series of Healthcare Shares, LP, a venture capital fund

focused on investing in social impact healthcare startups that improve healthcare and public health, as detailed in the advisor agreement dated March 21, 2025.

14.    Fund I, a series of Healthcare Shares, LP, is a venture capital fund specifically designed to include up to 250 physicians and healthcare executives as limited partners. The fund's innovative structure leverages the expertise of healthcare professionals to source deal flow, evaluate potential investments, and provide strategic guidance to portfolio companies. The fund completed its first closing in January 2025, has raised approximately $850,000 from 28 limited partners, and has already made investments in several promising healthcare startups addressing critical needs related to digital health and medical devices.

15.    The Fund I, a series of Healthcare Shares, LP, has already demonstrated its commitment to healthcare innovation by investing in companies such as: a developer of an unweighting gait-trainer for physical therapy; a creator of neuromodulation technology for sensory feedback; a company offering at-home oral glucose tolerance testing; a company providing at-home UTI tests; a company delivering telemedicine for insomnia through CBT-I; a company that built a network of physician investigators for pharmaceutical research; a mental healthcare telemedicine services company; a virtual obesity medicine clinic; and a CDC-recognized diabetes prevention startup (collectively, the "Healthcare Shares Start-ups"). These investments exemplify the type of innovative healthcare solutions that Kapszukiewicz, with her expertise in healthcare economics and strategy, is uniquely qualified to evaluate despite being barred from investing due to the SEC's arbitrary financial thresholds.

16.     In March and April 2025, Kapszukiewicz sought to invest in Fund I, a series of Healthcare Shares, LP, intending to contribute between $25,000 and $35,000, as aligned with the fund's minimum investment requirement of $25,000, as outlined in the investor presentation dated February 9, 2025. Kapszukiewicz availed herself of two third-party service providers that verify accredited investor status, AngelList and Verify Investor (at her own expense). However, both services informed Kapszukiewicz that she did not qualify as an accredited investor under SEC rules, specifically Rule 501 of Regulation D. This rule requires, among other things, investors to have a net worth exceeding $1 million (excluding primary residence) or an annual income of at least $200,000 ($300,000 jointly with a spouse) (the "Financial Restriction Rule").

17.     Despite her financial sophistication and direct involvement in healthcare investment decisions, Kapszukiewicz's annual income and net worth of approximately $850,000 fell short of the Financial Restriction Rule's thresholds, preventing her from investing in Fund I, a series of Healthcare Shares, LP.

18.     Following her exclusion from investing in Fund I, a series of Healthcare Shares, LP, in April 2025, the fund's management, recognizing Kapszukiewicz's extensive expertise and experience as a healthcare executive and business leader, appointed her as Chief Executive Officer of Owl Therapy effective April 15, 2025. A public benefit corporation, Owl Therapy is one of the fund's portfolio companies that delivers mental healthcare services via telemedicine visits with coaches, therapists, and psychiatrists. Owl Therapy was launched out of Healthcare Shares' venture studio through a $100,000 investment that the fund made as the first investor into Owl Therapy. In this role, Kapszukiewicz oversaw all fundraising, product development, sales, marketing,

operations, hiring, strategy, and partnerships for Owl Therapy, a Delaware public benefit corporation with a mission to deliver high quality mental healthcare services via telemedicine video visits with mental healthcare professionals such as coaches, therapists, and psychiatrists. Her appointment as the CEO underscores the fund managers' confidence in her ability to lead a portfolio company and evaluate investment opportunities in the healthcare sector.

19.     Kapszukiewicz's exclusion from investing in Fund I, a series of Healthcare Shares, LP, is particularly arbitrary given that she had already been recognized for her expertise—by serving as advisor to the Fund and serving as CEO of Owl Therapy. This timeline demonstrates that the Fund's managers had determined Kapszukiewicz possessed the requisite knowledge and experience to provide investment guidance to other accredited investors investing in Owl Therapy and to lead a portfolio company, yet ironically, she was prohibited from investing her own capital in the same opportunities she was deemed qualified to evaluate and lead professionally.

20.     As CEO of Owl Therapy, Kapszukiewicz qualified as an accredited investor in Owl Therapy (but not in Fund I, a series of Healthcare Shares, LP) under Rule 501(a)(4) of Regulation D, which includes directors, executive officers, or general partners of the issuer. Consequently, on May 20, 2025, Kapszukiewicz invested $25,000 in Owl Therapy, purchasing 301,075 shares of the company's Class A Common Stock at $0.0830 per share. This investment reflects her ability to assess and participate in private securities offerings in her professional domain, directly contradicting the SEC's assumption that her net worth renders her incapable of evaluating such investments. In fact, now Kapszukiewicz is raising capital from accredited investors in a 506c Reg D offering and is apparently sophisticated

enough to manage other accredited investor's money but not invest in a venture capital fund herself.

21.    The irony of the SEC's Financial Restriction Rule portion of the accredited investor rule is starkly illustrated by Kapszukiewicz's situation. While the rule permitted her to invest in Owl Therapy as its CEO (and to raise capital from other accredited investors for Owl Therapy), it continued to bar her from investing in Fund I, a series of Healthcare Shares, LP, the very fund that owns a majority stake in Owl Therapy and other healthcare startups she is professionally qualified to evaluate. This arbitrary restriction prevented Kapszukiewicz from diversifying her investment across the fund's portfolio of innovative companies, forcing her to concentrate her investment in a single portfolio company. This outcome undermines the SEC's purported investor protection goals by limiting Kapszukiewicz's ability to spread risk through the fund's diversified investment strategy, despite her demonstrated expertise and leadership within the same investment ecosystem. In the healthcare industry specifically, there are a large number of highly qualified professionals such as family medicine physicians, family nurse practitioners, or recent MBA graduates that make slightly under $200,000 per year, but do not qualify as accredited investors.

22.    Kapszukiewicz exemplifies an investor who is capable of assessing the risks of private offerings but is excluded due to her net worth being approximately $150,000 below the required threshold. Her exclusion from Fund I, a series of Healthcare Shares, LP, despite her advisory role and carried interest agreement signed on March 21, 2025, highlights the irrationality of the SEC's rule. The fund's purpose—to combine the expertise of healthcare professionals to identify and invest in promising healthcare startups—aligns

perfectly with Kapszukiewicz's professional background. Indeed, the fund's managers had already determined that Kapszukiewicz's expertise was valuable enough to warrant inclusion as an advisor with carried interest in the very investment decisions from which she is barred from participating as an investor.

23.    Furthermore, the SEC's Financial Restriction Rule harms Healthcare Shares by preventing it from accepting investments from highly qualified individuals like Kapszukiewicz, who bring not only capital but also invaluable expertise and industry connections that can benefit patients and the healthcare industry more broadly. By arbitrarily excluding such investors based on wealth thresholds, the rule undermines Healthcare Shares' mission to leverage the collective knowledge of healthcare professionals to drive innovation in the healthcare sector. This restriction limits the fund's ability to build a diverse and knowledgeable investor base, which is central to its investment strategy and social impact goals.

**B.    The SEC's attempt to protect investors through the Financial Restriction Rule portion of the accredited investor rule is increasingly harmful and contrary to Congressional intent.**

24.    The SEC's history of reviewing and amending the accredited investor definition, including 2020 amendments that added certain professional certifications as qualifying criteria, indicates that the agency recognizes the need for flexibility. However, these amendments did not address the fundamental issue of excluding sophisticated investors like Kapszukiewicz who do not hold such certifications or meet the accredited investor threshold.

**1.      Congress Did Not Authorize the SEC to Restrict Investor Choice Based on Wealth and Income.**

25.      The concept of an accredited investor was formally introduced into the Securities Act of 1933 in 1980, when Congress enacted the Small Business Investment Incentive Act. Congress directed the SEC to create rules to qualify "any person who, on the basis of such factors as financial sophistication, net worth, knowledge, and experience in financial matters, or amount of assets under management" as an accredited investor. This definition was intended to facilitate capital formation for small businesses by expanding investment opportunities beyond restrictive interpretations of private offering exemptions.

26.      In 1982, the SEC promulgated Regulation D, which established the foundational definition of an accredited investor that persists largely unchanged today. However, despite Congress's clear directive to consider factors such as financial sophistication and knowledge, the SEC's definition primarily relies on rigid financial thresholds. Despite inflation and significant economic changes over the past four decades, these thresholds have remained largely static, highlighting the arbitrary nature of the Financial Restriction Rule.

27.      The SEC's Financial Restriction Rule portion of the accredited investor rule contradicts congressional intent by treating wealth and income as the primary proxies for investor sophistication. The statutory language explicitly allows for qualification based on "financial sophistication" and "knowledge, and experience in financial matters," yet the SEC has failed to implement meaningful pathways for financially sophisticated individuals who lack sufficient wealth or income to qualify. This approach lumps together "the elderly with substantial retirement savings and lottery winners with windfall profits" alongside individuals whose financial acumen derives from genuine expertise, while excluding

financially sophisticated individuals who may have deep knowledge and experience but lack sufficient net worth.

28.    Regulation D enables issuers to sell securities to up to thirty-five non-accredited purchasers, provided (i) the issuer conduct sufficient diligence to form a reasonable belief that each purchaser who is not an accredited investor, either alone or with her purchaser representative(s), has such knowledge in financial and business matters that she is capable of evaluating the merits and risks of the investment; and (ii) the issuer must disclose to non-accredited investors specific financial and non-financial information of the type required for certain public offerings. Thus, although it may be possible for issuers to sell their securities to non-accredited investors, the risk of statutory rescission liability and associated secondary control person liability for non-compliance with the rule lead issuers to limit Regulation D offerings to accredited investors. For similar reasons, issuers and their counsel are reluctant to rely on fact-specific tests developed under the common law to accept non-accredited investors pursuant to the Section 4(a)(2) statutory exemption.

**2.    The current accredited investor framework has contributed to a significant market anomaly—the overwhelming majority of American households is unable to participate in the segment of capital raising that dwarfs the investing opportunities available in public markets.**

29.    The scale of the private markets has grown remarkably. In 2006, the total capital raised through Rule 144A deals—available only to large institutional investors—was already greater than the amount raised on the American Stock Exchange, the NASDAQ, and the New York Stock Exchange combined. By 2007, global equity and debt capital raised in Rule 144A offerings approached $1 trillion, highlighting how the most significant capital-raising activity occurs in markets from which ordinary investors are systemically barred.

30.     The disparate impact of the accredited investor definition's Financial Restriction Rule falls unevenly across racial and geographic lines in American society. Those who qualify as accredited investors are disproportionately white and concentrated on the country's coasts. According to Federal Reserve data, there is a significant earnings and wealth gap between white households and Black and Hispanic households. While 10.8% of white households earned more than $200,000 per year in 2019, only 5.3% of Hispanic households and 4.6% of Black households earned the same.

31.     The accredited investor definition effectively creates a two-tiered investment system that reinforces wealth inequality. Nearly 75% of the families in the wealthiest 1% own privately held businesses, and private business assets make up more than one-third of their balance sheets, yet the accredited investor definition prevents a disproportionate portion of minority households from accessing such an equity ownership stake.

32.     The continued existence of the Financial Restriction Rule portion of the accredited investor rule is particularly troubling given that many companies now stay private longer before going public. The median age of companies accessing the public markets through an IPO over the past twenty years is about eleven years. Given the extended period of time that many companies remain private, it is likely that many companies are past their high growth phase by the time most people can invest in them, meaning non-accredited investors miss the opportunity for the most significant returns.

33.     The Financial Restriction Rule portion of the accredited investor rule is no guarantee of financial sophistication, and many non-wealthy individuals possess substantial financial knowledge that could qualify them under the statutory language. In

fact, it has created substantial geographic disparities in capital access. According to the SEC Office of the Advocate for Small Business Capital Formation's 2024 Annual Report (2024 SEC Report), in 44 states, an individual can be in the top 10% of income earners yet still fall below the $200,000 individual income threshold required by the SEC's definition. This incongruity demonstrates how the arbitrary threshold excludes high-earning, financially sophisticated individuals from investment opportunities based solely on their geographic location rather than their financial capabilities or knowledge.

34.     The disparate impact is further evidenced by the concentration of accredited investors in certain metropolitan areas, predominantly on the coasts. The 2024 SEC report shows that while a very small percentage of U.S. households qualify as accredited investors, these investors are disproportionately concentrated in high-cost-of-living areas, creating a geographic barrier to capital formation that prevents entrepreneurs in middle America, like Kapszukiewicz, from accessing capital from local investors who may be most likely to support their businesses.

35.     Statistical evidence reveals that rule modifications could significantly broaden the pool of potential investors. For example, the 2024 SEC report indicates that VC fund managers that fundraise using Rule 506(c), which allows advertising to accredited investors, are 36% more likely to be first-time fund managers and are significantly more likely to invest in startups with first-time, women, and non-elite school entrepreneurs. This demonstrates how modest adjustments to capital-raising rules can create greater opportunities for new and diverse entrepreneurs without removing any safeguards.

36.     Data from the 2024 SEC report also shows that women and racially diverse entrepreneurs face disproportionate challenges under the current accredited investor

definition due to the historic wealth gap. African American/Black and Hispanic/Latino investors are excluded from the accredited investor definition at higher rates than other ethnicities, limiting the diversity of investment capital allocated to entrepreneurs. By restricting investment pools through arbitrary income and wealth thresholds (rather than knowledge-based criteria specifically authorized by Congress), the SEC's rules exacerbate existing inequities in capital formation, particularly for investors like Plaintiff Kapszukiewicz who may not have pre-existing networks of wealthy investors.

37.    Plaintiffs suffered harm from the SEC's rigid wealth-based restrictions because they have fundamentally distorted the capital formation landscape by crowding out alternative regulatory frameworks that might permit broader investor participation without sacrificing investor protection. Regulation D was originally intended to provide a balanced, efficient pathway for small and emerging businesses to access capital from a diverse set of investors. However, the balance was upset because of judgment calls by the SEC in setting the bright line net worth and income tests for the sake of simplicity. The system has become dominated by Rule 506 offerings restricted to accredited investors, effectively marginalizing more inclusive and flexible exemptions. This shift is not the product of improved investor safeguards, but rather a rational response by issuers to avoid the risks of losing the bright-line protections offered by the 506 wealth and income tests. By refusing to modernize investor qualification standards to reflect actual sophistication, the SEC has abandoned the balance between capital formation and investor protection that Regulation D was created to achieve. This distortion not only harms Plaintiffs but also undermines the broader policy goals of the Securities Act by entrenching a system where

wealth and income, not knowledge, experience, and self-determination, determine who can invest.

38.    In 2020, the SEC made modest amendments to the accredited investor definition, extending it to include individuals who hold certain professional credentials (Series 7, Series 65, and Series 82 certifications) and "knowledgeable employees" of private funds. However, this small expansion did little to address the fundamental problems with Financial Restriction Rule portion of the accredited investor rule and still fails to implement the full range of qualification factors Congress specifically authorized in 1980, including financial sophistication, knowledge, and experience in financial matters.

### 3.    The SEC's Financial Restriction Rule portion of the accredited investor rule causes real and measurable harm.

39.    The SEC's arbitrary financial thresholds have caused direct and measurable harm to Kapszukiewicz. Between April 1 and April 8, 2025, Kapszukiewicz's Northwestern Mutual retirement account suffered a decline of approximately $16,500, a drop of approximately 10% in just one week. This loss represents a significant portion of the $25,000 she sought to invest in Fund I, a series of Healthcare Shares, LP, highlighting the paradox of the SEC's rule – while supposedly "protecting" Kapszukiewicz from private investments in her field of expertise, she instead remained exposed to significant public market volatility in investments she has less direct knowledge about or influence over.

40.    The harm extends beyond pure financial loss. Kapszukiewicz, who intentionally chose to prioritize mission-driven work over personal wealth accumulation, discovered that her values-based career choices effectively barred her from participating in healthcare innovation as an investor, despite being deemed qualified to lead it as an executive. This exclusion caused Kapszukiewicz measurable emotional distress and

represents a significant barrier to her ability to diversify her investments into areas aligned with her professional expertise, where she could better evaluate risks and potential returns than in the public markets where her retirement savings are currently invested.

41.    Kapszukiewicz's situation illustrates how the SEC's rule creates a perverse incentive structure that rewards wealth accumulation (or inheritance) over expertise and professional knowledge. After discovering she could not qualify as an accredited investor, Kapszukiewicz offered to donate the money to support some of the fund's portfolio companies (which the accredited investor restrictions would not have prohibited) rather than invest it – an absurd outcome that demonstrates how the rule fails to achieve its purported investor protection goals while actively preventing knowledgeable individuals from participating in investment opportunities in their fields of expertise.

42.    Kapszukiewicz's experience reflects a broader pattern of disparate impact. As someone who intentionally chose to reject what she considers the harms of capitalism by not prioritizing wealth accumulation and instead trying to redistribute wealth by only charging consulting fees when necessary to pay for household expenses or to enable a significant degree of pro bono work, Kapszukiewicz found herself excluded from investment opportunities by a regulatory system that privileges wealth accumulation and income over expertise and social impact. This exclusion is particularly harmful for individuals like Kapszukiewicz who make intentional career choices to prioritize mission-driven work and impact over personal wealth accumulation. As Kapszukiewicz consistently leaves money on the table for those with greater needs than her own, even turning down and refraining from applying for any scholarships or financial aid for being a minority when applying for college. These value-driven financial choices, which reflect

her commitment to addressing what she views to be institutional and structural barriers to entrepreneurs, especially in communities which foster leadership among women, cultural minorities, working class, and people with disabilities, effectively punish her under the SEC's wealth-and-income based regulatory framework.

## C.   The SEC failed to adequately consider impact on efficiency, competition, and capital formation.

43.   The Securities Act requires the SEC to consider whether a regulation "will promote efficiency, competition, and capital formation" when engaged in rulemaking under the Act. 15 U.S.C. § 77b(b). This obligation is not merely procedural but requires substantive consideration and reasoned analysis.

44.   The SEC's 1982 adopting release for the accredited investor Financial Restriction Rule failed to adequately fulfill this statutory obligation in several critical respects:

(a)   The SEC failed to conduct any quantitative assessment of how the wealth and income thresholds impact efficiency in capital markets, relying instead on conclusory assertions that such thresholds protect investors without meaningful economic analysis;

(b)   The SEC acknowledged in the 1982 adopting release that "it is not possible to quantify the impact of the revised rule and amendments on efficiency, competition and capital formation," yet made no apparent effort to collect data or build economic models that could inform its rulemaking despite having the resources and expertise to do so;

(c)   The release contained no substantive analysis of how the Financial Restriction Rule would affect competition between issuers who have access to wealthy investors and those who do not, despite clear evidence that such effects would be significant and potentially market-distorting;

(d)    The SEC failed to adequately consider alternatives that might have achieved investor protection goals with less adverse impact on capital formation, particularly for diverse founders and underrepresented communities;

(e)    The SEC failed to conduct any serious economic analysis of how wealth thresholds serve as an effective proxy for investor sophistication, despite this being the central economic premise underlying the Rule; and

(f)    The SEC's 2020 amendments to the accredited investor definition admitted that "wealth, income, and net worth are incomplete proxies for financial sophistication" yet failed to adequately reconsider the fundamental economic basis for the Rule's arbitrary thresholds.

45.    In the more than four decades since the Financial Restriction Rule's adoption, robust economic research has demonstrated that wealth thresholds have significant negative effects on capital allocation efficiency, yet the SEC has failed to adequately incorporate this research into its rulemaking process for maintaining and amending the rule.

46.    The SEC's failure to consider the rule's impact is particularly egregious in the context of funds like those managed by Healthcare Shares, which are designed to democratize access to venture capital investments in healthcare by including healthcare professionals as investors. By maintaining arbitrary financial thresholds, the SEC impedes the ability of such funds to raise capital from a broader pool of knowledgeable investors, thereby stifling competition and innovation in the healthcare investment space.

47.    The SEC's failure to conduct a substantive economic analysis renders the Financial Restriction Rule arbitrary and capricious, as the agency did not engage in

reasoned decision-making concerning the Rule's likely effects on the efficiency of capital markets, competition among issuers, and capital formation, particularly for underrepresented founders.

48.    This failure is particularly significant because the rule creates a bifurcated capital market system with distinct economic consequences, yet the SEC has not adequately analyzed these market-structuring effects despite its statutory obligation to do so.

**D.    The SEC unlawfully restricts Plaintiffs' protected expressive and associational investment activity.**

49.    Fund I, a series of Healthcare Shares, LP, operated by Healthcare Shares, represents a paradigmatic example of expression-rich investment, as evidenced by its stated social mission to transform healthcare delivery, and commitment to balancing 'social impact with for-profit returns.' The fund's unique model of gathering up to 250 physicians and healthcare executives as limited partners to collectively support healthcare innovations demonstrates its associational and expressive nature. By investing in startups like the Healthcare Shares Start-ups described above, the fund expresses support for specific approaches to healthcare improvement that align with both Plaintiffs' professional values and expertise. Kapszukiewicz, who is deeply committed to supporting under-represented people and being an advocate and activist for women's rights, progressive support for minority-owned businesses, social justice, and radical transformation of the healthcare industry, is precisely the type of mission-driven investor whose expressive interests are harmed by the SEC's rigid financial thresholds. Fund I, a series of Healthcare Shares, LP explicitly positions itself in opposition to traditional venture capital firms who do not have an equal level of drive to have a social impact and promises investors the opportunity to

participate in a community that advances specific ideological and healthcare reform goals.

50.     Plaintiffs' participation in such an offering is not merely economic in nature but constitutes expressive conduct protected by the First Amendment—intended to communicate Plaintiffs' belief in the vital importance of physician-led healthcare innovation, the social impact mission of the fund, and support for the democratization of investment in healthcare transformation. By investing in Fund I, a series of Healthcare Shares, LP, Plaintiff Kapszukiewicz would be engaging in associational expression with a community of like-minded healthcare professionals seeking to advance the "quintuple aim" of healthcare improvement specifically highlighted in the fund's mission statement.

51.     The SEC, through its promulgation, enforcement, and application of the Financial Restriction Rule portion of the accredited investor rule, has prohibited Plaintiffs from engaging in expressive conduct solely on the basis of Kapszukiewicz's financial status, despite her unique qualifications as an advisor to the very fund in which she seeks to invest. This financial threshold bears no rational relationship to her ability to evaluate the investment's expressive components, her commitment to its social mission, or her right to associate with this community of healthcare innovators. Similarly, the rule restricts Healthcare Shares from accepting investments from individuals like Emily, thereby limiting its ability to build a community of investors who share its mission and values.

52.     By preventing Kapszukiewicz from investing in Fund I, a series of Healthcare Shares, LP, the SEC is unconstitutionally restricting Plaintiffs' ability to engage in a form of political, social, and ideological expression through investment. In short, Kapszukiewicz's desired investment represents her wish to express support for healthcare transformation and associate with a community advancing that goal.

53.     The SEC's prohibition operates as a content-neutral restriction on expressive conduct that fails intermediate scrutiny, as it burdens substantially more speech than necessary to achieve the government's investor protection goals. Less restrictive alternatives—such as investor education requirements, sophistication testing, scaled investment limits, or enhanced disclosure requirements—would achieve the SEC's regulatory objectives without categorically excluding knowledgeable investors like Kapszukiewicz from participating in expressive investment activity based solely on wealth thresholds. The current rule fails to leave sufficient alternative channels open for this form of investment-based expression, as private investment markets represent a unique forum with no public market equivalent for expressing support for early-stage healthcare innovation.

### FIRST CLAIM FOR RELIEF

Administrative Procedure Act
(Contrary to Law)
5 U.S.C. §706

54.     Plaintiffs incorporate the previous paragraphs as if fully restated here.

55.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law." 5 U.S.C. §706(2)(A).

56.     The Financial Restriction Rule portion of the accredited investor ruleviolates Section 23(a)(2) of the Exchange Act because it "impose[s] a burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. 15 U.S.C. § 78w(a)(2).

57.     Accordingly, the Financial Restriction Rule portion of the accredited investor rule is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**

Administrative Procedure Act
(Arbitrary and Capricious)
5 U.S.C. §706

58.     Plaintiffs incorporate the previous paragraphs as if fully restated here.

59.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

60.     The Financial Restriction Rule portion of the accredited investor rule is arbitrary and capricious. Among other things, the SEC failed to engage in reasoned decision-making by failing: to provide a reasoned basis for the Rule; to consider important aspects of the problem it believed it faced; to define the term "accredited investor" in a comprehensible manner; to consider and address relevant comments; to acknowledge and provide good reasons for changing policy positions; and to adequately address the economic consequences of its final action.

61.     Accordingly, Financial Restriction Rule portion of the accredited investor rule is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

Administrative Procedure Act
(Without Statutory Authority)
5 U.S.C. §706

62.     Plaintiffs incorporate the previous paragraphs as if fully restated here.

63.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(C).

64.     The Financial Restriction Rule portion of the accredited investor rule exceeds the SEC's statutory authority and lacks any limiting principle because it captures investors who are sophisticated and capable of assessing their own investment decisions.

65.     Accordingly, Financial Restriction Rule portion of the accredited investor rule is in excess of statutory jurisdiction, authority, or limitations, in violation of 5 U.S.C. § 706(2)(C).

## FOURTH CLAIM FOR RELIEF

### (Violation of First Amendment Rights – Expressive Conduct and Association)

66.     Plaintiffs incorporate the previous paragraphs as if fully restated here.

67.     The First Amendment to the United States Constitution protects persons' right to speak, and to refrain from speaking. This protection, which extends to statements that the speaker does not wish to make, covers corporations and individuals alike.

68.     Plaintiffs' desired participation in private offerings constitutes expressive conduct protected by the First Amendment. Such participation conveys Plaintiffs' support for particular business models, social aims, innovations, and ideological commitments.

69.     The SEC's regulation of private offerings under Regulation D, specifically its restriction of participation based on financial thresholds under the accredited investor definition, constitutes a content-neutral but burdensome regulation of protected expressive and associational conduct.

70.     These restrictions are not narrowly tailored to serve a compelling or even substantial government interest. There exist less restrictive means—such as investor certification or education programs—to achieve investor protection without infringing on constitutionally protected activity.

71.    The SEC's rules also fail to provide Plaintiffs with alternative channels through which they can engage in the same expressive conduct, as the private capital markets are categorically closed to non-accredited investors regardless of sophistication or intent.

72.    Accordingly, Financial Restriction Rule portion of the accredited investor rule unlawfully suppresses Plaintiffs' speech and association, in violation of the First Amendment, and chills Plaintiffs' ability to express support for enterprises they wish to endorse through investment activities.

73.    Plaintiffs seek declaratory and injunctive relief invalidating the accredited investor wealth and income requirements as applied to expressive investment activity, and any other relief the Court deems just.

## FIFTH CLAIM FOR RELIEF

### (Violation of Equal Protection – Wealth-Based Classification)

74.    Plaintiffs incorporate the previous paragraphs as if fully restated here.

75.    The Fifth Amendment to the United States Constitution incorporates the equal protection principles of the Fourteenth Amendment and prohibits the federal government from denying any person the equal protection of the laws.

76.    The SEC's Financial Restriction Rule portion of the accredited investor rule creates an impermissible wealth-based classification that treats financially sophisticated individuals differently based solely on their net worth and income, without sufficient justification for such disparate treatment.

77.    The rule disproportionately disadvantages individuals like Plaintiff Kapszukiewicz who possess substantial financial sophistication, professional expertise,

and industry knowledge, but who do not meet arbitrary financial thresholds that bear no rational relationship to their ability to evaluate investment opportunities.

78.    The Financial Restriction Rule substantially burdens Kapszukiewicz's fundamental interest in participating in private investments in her field of expertise, where she has demonstrated exceptional knowledge and competence through her professional accomplishments and advisory role with the very fund in which she seeks to invest.

79.    The SEC's classification fails the rational basis standard of review, as wealth is not rationally related to investment sophistication, particularly in specialized fields where professional expertise and industry experience, like Kapszukiewicz's, provide superior ability to evaluate investments than mere possession of wealth.

80.    This wealth-based classification system disproportionately impacts anyone who chooses mission-driven careers, perpetuating existing disparities in access to investment opportunities without advancing any legitimate governmental interest.

81.    Accordingly, the SEC's Financial Restriction Rule violates equal protection principles and should be declared unconstitutional.

## REQUEST FOR RELIEF

Plaintiffs request that this Court:

A.    Declare that the Financial Restriction Rule portion of the accredited investor rule violates the U.S. Constitution and is null, void, and with no force or effect;

B.    Declare that the Financial Restriction Rule portion of the accredited investor rule was promulgated by the SEC's in excess of statutory authority or limitations within the meaning of 5 U.S.C. § 706(2)(C) and is arbitrary and capricious and otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

C.      Vacate and set aside the Financial Restriction Rule portion of the accredited investor rule, severing it from the remainder of the accredited investor rule;

D.      Enjoin the SEC and all its officers, employees, and agents from implementing, applying, or taking any action whatsoever under the Financial Restriction Rule portion of the accredited investor rule;

E.      Remand the Financial Restriction Rule to the SEC for further review, directing it to consider non-wealth and income criteria;

F.      Award Plaintiffs their costs and reasonable attorney's fees; and

G.      Grant such further and other relief as the Court deems just and proper.

Dated:  September 8, 2025             Respectfully submitted,

**INVESTOR CHOICE ADVOCATES NETWORK**

By:      :/s/  Nicolas Morgan
         Nicolas Morgan
         CA Bar No. 166441
         (*Pro hac vice* forthcoming)
         453 S. Spring Street, Suite 400
         Los Angeles, CA 90013
         Telephone: (310) 849-0384
         Email: nicolas.morgan@icanlaw.org

**GRAY REED**

By:      /s/ Angela L. Brown
         Chris Davis
         State Bar No. 24050483
         Angela L. Brown
         State Bar No. 24034533
         Drake Rayshell
         State Bar No. 24118507
         1601 Elm Street, Suite 4600
         Dallas, Texas 75201
         Tel: (214) 954-4135
         Fax: (214) 953-1335
         Email: cdavis@grayreed.com
         Email: abrown@grayreed.com
         Email: drayshell@grayreed.com

         *Attorneys for Plaintiffs Emily Kapszukiewicz
         and Healthcare Shares, P.B.C.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing instrument was electronically filed with the Clerk of the court using the CM/ECF system on, which will send notification to the attorneys of record for all parties to this suit on the 8th of September, 2025.

                    /s/ Angela L. Brown
                    Angela L. Brown